In re **KEENE CORPORATION**, Debtor.

**KEENE CORPORATION**, Plaintiff,

v.

Jessie D. **COLEMAN**, et al., Defendants.

**Bankruptcy No. 93 B 46090 (SMB).
Adv. No. 94–8015A.**

United States Bankruptcy Court,
S.D. New York.

March 3, 1994.

Berlack Israels & Lieberman (Carole L. Fern, Edward S. Weisflener, Diane C. Beveridge, Janice B. Grubin, of counsel), New York City, Gainsburg & Hirsch, Purchase, NY, for debtor/plaintiff.

Levy Phillips & Konigsberg (Stanley J. Levy, of counsel), New York City, for certain creditors.

Marcus Montgomery Wolfson & Burten, P.C. (Leon C. Marcus, John J. Preefer, of counsel), New York City, for Official Committee of Unsecured Creditors.

Arthur J. Gonzalez, Acting U.S. Trustee (Brian Masumoto, of counsel), New York City.

## MEMORANDUM DECISION GRANTING MOTION FOR PRELIMINARY INJUNCTION AND DIRECTING THE APPOINTMENT OF AN EXAMINER

STUART M. BERNSTEIN, Bankruptcy Judge.

The debtor-in-possession, Keene Corporation ("Keene"), seeks declaratory and injunctive relief preventing the continuation of approximately 1,600 lawsuits. Commenced by Keene's creditors and pending throughout the country, the lawsuits challenge the legality of Keene's transfer of over $200 million of its assets to its then affiliates during the 1980s and the subsequent spinning off of certain of these affiliates (collectively the "Wrongful Transfer Claims"). The defendants in these actions are Keene's former parent and former affiliates (collectively the "Corporate Defendants"), and certain of the present and former officers, directors and shareholders of Keene and these companies (collectively the "Individual Defendants"). Keene also seeks an order directing the appointment of an examiner to determine the viability of the Wrongful Transfer Claims.

For the reasons stated below, the Court declares that the automatic stay prevents the continued prosecution of the Wrongful Transfer Claims. Alternatively, the Court enjoins their prosecution and directs the appointment of an examiner under the conditions set forth below.

### FACTS

The background relating to the Keene bankruptcy is set forth in this Court's prior opinion denying Keene's motion for unrelated injunctive relief. *See Keene Corporation v. Acstar Insurance Co. (In re Keene Corporation)*, 162 B.R. 935 (Bankr.S.D.N.Y.1994). The Court assumes that the reader is familiar with those facts, and will not repeat them.

The Wrongful Transfer Claims concern certain transactions between Keene on the

one hand and certain affiliated entities on the other that occurred during the 1980s. The affiliated entities are Keene's former parent, Bairnco Corporation ("Bairnco"), and five Bairnco wholly owned subsidiaries: Kaydon Corporation ("Kaydon"), The Genlyte Group ("Genlyte"), Kasco Corporation ("Kasco"), Shielding Systems Corporation ("Shielding"), and Arlon, Inc. ("Arlon"). In 1981, Bairnco was formed to serve as a holding company for all of Keene's common stock. Subsequent to Bairnco's formation, and during the ensuing years, Bairnco's subsidiaries were formed for the purpose of acquiring certain of Keene's assets. The transactions between Keene and the five Bairnco subsidiaries[1] were as follows:

| Subsidiary | Keene Assets Acquired | Purchase Price | Year |
|---|---|---|---|
| Kaydon | Industrial Bearings and Fittings Division | $65,000,000.00 | 1983 |
| Genlyte | Lighting Division | $52,500,000.00 | 1984 |
| Kasco | Cutting Services Division | $ 9,000,000.00 | 1986 |
| Shielding | Electromagnetic and Shielding Divisions | $49,500,000.00 | 1987–88 |
| Arlon | Laminate and Coded Products Division | $48,000,000.00[2] | 1989 |

Subsequent to some of the transactions, Bairnco spun off certain of these subsidiaries. At present, Kasco, Shielding and Arlon continue to be subsidiaries of Bairnco. Keene, Genlyte and Kaydon are no longer subsidiaries of Bairnco, although they may be owned in whole or in part by Bairnco's former shareholders.

Prior to bankruptcy, Keene's creditors attacked these transfers. According to Keene, approximately 1,600 such actions were commenced against the former Keene affiliates as well as former and present officers, directors and shareholders of Keene and the affiliates. These include class actions filed in the United States District Courts for the Southern and Eastern Districts of New York.

The Southern District case, entitled *Coleman v. Bairnco Corporation*, 93 Civ. 5593, and assigned to District Judge Patterson, was commenced on August 11, 1993. The defendants include the six affiliates and seven individuals who are present or former officers, directors or shareholders of Keene or the affiliates. The gravamen of the *Cole-man* complaint, set forth in paragraph 38, is that:

> In early 1981, therefore, Keene's management, under the direction of defendant Bailey [Keene's President and Chairman], embarked upon a plan to defraud Keene's asbestos creditors by restructuring Keene so as to put its profitable operations and assets with growth potential into new companies that they would continue to control but which would be beyond the reach of Keene's asbestos creditors.

The *Coleman* complaint consists of eight "counts". The first two counts charge that the sale of Keene's assets to the five Bairnco subsidiaries constituted fraudulent conveyances under New York State law.[3] The third count asserts successor liability "[b]ecause each of the related transferees knew or had reason to know of Keene's asbestos liabilities at the time of these transfers, each of these defendants assumed the liabilities or otherwise acquired the transferred assets subject to the liabilities." (Coleman Complaint, ¶ 68). The fourth count asserts tort liability based on piercing the corporate veil because

1. In some cases, Keene sold the assets to a predecessor of the Bairnco subsidiary. For the sake of brevity, the Court will collapse these transactions and treat them as if they occurred solely between Keene and the ultimate acquiring subsidiary.

2. The purchase price includes $44,000,000.00 in cash and the assumption of $4,000,000.00 of existing indebtedness.

3. In its moving papers, Keene suggests that Delaware law is controlling because Keene is a Delaware corporation. The Court disagrees. At the time of the transfers, Keene was a New York corporation. Therefore, New York law governs.

"Bairnco and the individual defendants exercised their domination and control of Keene and the other corporate defendants to denude and strip assets from Keene in violation of the [New York Debtor and Creditor law], to transfer those assets to the other corporate defendants, and to enrich themselves at the expense of Keene's asbestos creditors." (Coleman Complaint, ¶ 72).

The fifth and sixth counts allege a second generation of fraudulent transfers. They attack the spinoff of the Kaydon and Genlyte stock to Bairnco's shareholders on the theory that because Bairnco and Keene are alter egos, Bairnco's transfer of its assets (the stock in Kaydon and Genlyte) were fraudulent as to the Keene/Bairnco creditors. Count seven alleges that the individual defendants breached their fiduciary duties to Keene, Bairnco and the asbestos creditors by "denuding and stripping Keene of its assets and its profit making and growth potential." (Coleman Complaint, ¶ 90). Finally, count eight charges a conspiracy among all defendants to "defraud and denude Keene and to strip and dismantle its assets, as well as its potential for future profits and growth, so as to impair the right of Keene's asbestos creditors to recover for their injuries." (Coleman Complaint, ¶ 95).

The case of *Huffman v. Bairnco Corporation* was filed in the United States District Court for the Eastern District of New York at approximately the same time, and is pending before District Judge Jack B. Weinstein. The allegations in the complaint are the same as *Coleman*. The complaint names the six former affiliates as defendants, as well as thirty-two individuals who were either former or present officers, directors or shareholders of Keene or the other six former affiliates. In language reminiscent of the *Coleman* case, the plaintiffs in this action, charged that:

In early 1981, therefore, Keene's management, under the direction of Bailey, embarked upon a plan to restructure Keene so as to put its profitable operations and assets with growth potential into new companies that they would control but which would be beyond the reach of Keene's asbestos creditors.

Huffman Complaint, ¶ 62.

The *Huffman* complaint consists of ten claims; the first five charge fraudulent conveyances under New York law. The sixth charges successor corporate liability; the seventh, tort liability based on piercing the corporate veil; the eighth, breach of the individual defendants' fiduciary duties to Keene and its asbestos creditors; and the ninth, liability for injuries on account of acts in furtherance of a conspiracy to defraud. The tenth claim charges a joint enterprise liability among the Corporate Defendants all of whom "participated in a joint enterprise with a common purpose to strip and dismantle Keene's assets, as well as its potential for future profits and growth, in order to impair the right of Keene's asbestos creditors to recover for their injuries." (Huffman Complaint, ¶ 117).

## DISCUSSION

### A. THE AUTOMATIC STAY

#### 1. Introduction

A common theme runs through the *Coleman* and *Huffman* complaints. They allege that the class plaintiffs hold claims for asbestos related injuries against Keene, and that Keene's transfer of assets to affiliates, and the spinning off of the stock of certain of those affiliates, including Keene, to Bairnco's shareholders, have impeded and prevented these creditors from collecting damages from Keene. The class plaintiffs' objective is to expand the pool of assets available to satisfy their claims by imposing liability on the non-debtor Corporate Defendants and Individual Defendants.

Keene argues that the commencement or continuation of actions involving such claims is barred by the automatic stay, and even if it is not, that the Court should extend the automatic stay under 11 U.S.C. § 105(a). This Court has stated on a prior occasion that filing of the Keene petition triggered the broad protections of the automatic stay. *See Keene v. Acstar Insurance Co.*, 162 B.R. at pp. 938–39. The stay is not limited to protecting the debtor or property of the estate,

but also presents the "commencement or continuation ... of a judicial, administrative or other action or proceeding ... to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).

Although beyond cavil, it bears repeating that the automatic stay is one of the most fundamental debtor protections. But it does not only protect the debtor; it also protects creditors:

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 340 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 54–55 (1978), U.S.Code Cong. & Admin.News 1928, pp. 5787, 6297, *accord S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1146 (5th Cir.1987); *American Nat'l Bank v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1274 (5th Cir.1983).

Where bankruptcy creditors are concerned, the race is not supposed to belong to the swift; equality rather than expedition is the governing principle:

> The automatic stay thus prevents a multijurisdictional rush to judgment whose organizing principle could only be first-come-first-served, and protects the interests of all creditors by treating like-situated claimants equally.

*In re MortgageAmerica Corp.*, 714 F.2d at 1274 (footnote omitted).

■ Further, Section 105(a) authorizes the Court to issue an injunction, broader than the automatic stay, to ensure an orderly reorganization:

> Section 105(a) empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." It is a broad grant of power which exceeds the limits of the automatic stay, and empowers the Court to "use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Neuman*, 71 B.R. 567, 571 (S.D.N.Y.1987) (quoting *In re Baldwin–United Corp. Litigation*, 765 F.2d 343, 348 (2d Cir.1985)) (citing *In re Johns–Manville Corp.*, 40 B.R. 219 (S.D.N.Y.1984)).
>
> ....
>
> Under Section 105, however, a debtor need not show irreparable harm. *In re Neuman*, 71 B.R. at 571; *C & J Clark America, Inc. v. Carol Ruth, Inc., (In re Wingspread Corp.)*, 92 B.R. 87, 92 (Bankr. S.D.N.Y.1988). Rather, the Court can enjoin an activity that threatens the reorganization process or impairs the court's jurisdiction with respect to a case before it. *Alert Holdings, Inc. v. Interstate Protective Services, Inc.*, 148 B.R. 194, 200 (Bankr.S.D.N.Y.) (citing *LTV Steel Company, Inc. v. Bd. of Educ. (In re Chateaugay Corp. Reomar, Inc.)*, 93 B.R. 26, 29 (S.D.N.Y.1988)).

*Keene v. Acstar Insurance Co.*, 162 B.R. at p. 944.

In the *Huffman* and *Coleman* actions, the plaintiffs seek to follow the transferred assets, impose liability and/or disregard the corporate separateness among Keene, the Corporate Defendants and the Individual Defendants, in order to expand the pool of assets available to satisfy their claims. That being the case, the continuation of their efforts violates the automatic stay;[4] the Wrongful Transfer Claims should be asserted, in the first instance, by Keene or any other estate representative designated for that purpose.[5]

---

4. The Court's conclusion is not limited to the *Coleman* and *Huffman* plaintiffs. It applies to any creditor of Keene that seeks to collect its asbestos-related claim against a third party under similar theories.

5. In this decision, the Court's reference to Keene or the debtor or the trustee as the party with

## 2. The Fraudulent Transfer Claims

In *FDIC v. Hirsch (In re Colonial Realty Company )*, 980 F.2d 125 (2d Cir.1992), the Court of Appeals held that fraudulent transfer claims asserted by creditors of the debtor against third party transferees of the debtor's assets are automatically stayed by 11 U.S.C. § 362(a)(1). The FDIC, as receiver to several failed banks, held claims against the partnership debtor, Colonial Realty Company, as well as its debtor general partners, Messrs. Googel and Sisti. The FDIC commenced a federal district court action in Florida against Mrs. Sisti, a non-debtor, seeking to recover approximately $10,000,-000.00 which the debtor, Mr. Sisti, had allegedly fraudulently transferred to her. Upon learning of the action, the trustee moved in the United States Bankruptcy Court for the District of Connecticut for an order determining that the Florida action violated the automatic stay because the fraudulent transfer claims were property of the estate and for an injunction against its continuation. The Bankruptcy Court granted the trustee's motion, and on appeal, the District Court affirmed.

The Court of Appeals affirmed the District Court, although on different grounds. It rejected the trustee's argument that the fraudulent transfer claims were property of the estate. 980 F.2d at 131. Under Section 541(a)(3) of the Bankruptcy Code, property of the estate includes property which the trustee recovers under various provisions of the Bankruptcy Code, including Section 550 which provides the remedy for recovering, *inter alia*, fraudulently transferred property. 980 F.2d at 131. If fraudulently transferred property were considered property of the estate *prior* to its recovery, Section 541(a)(3) would be meaningless. *Id.*

Rather, "a third party action to recover fraudulently transferred property is properly

regarded as undertaken 'to recover a claim against the debtor' and subject to the automatic stay pursuant to § 362(a)(1)". *Id.* at 131–32. The FDIC's Florida action was designed to recover from Mrs. Sisti a claim it held against the debtor, Mr. Sisti. If Mr. Sisti were not liable to the FDIC, the FDIC would not have a claim against Mrs. Sisti. *Id.* at 132. The FDIC's status, therefore, as a creditor of the debtor Sisti, was the sole basis of its standing to assert a claim against the transferee of Sisti's assets.

■ *Colonial Realty* forecloses creditor claims based upon the fraudulent transfer of Keene's assets.[6] Where a Keene creditor seeks to recover his or her claim from a transferee of Keene's property, the creditor's action is stayed by Section 362(a)(1). Instead, the trustee alone has standing to assert such claims, 11 U.S.C. § 544, and this result promotes the principle of equitable distribution.

## 3. Disregard of Corporate Separateness

The *Huffman* and *Coleman* plaintiffs also seek to disregard the corporate separateness among Keene, the Corporate Defendants and the Individual Defendants, based upon various common law theories including, primarily, piercing the corporate veil and successor tort liability. These claims do not seek to recover fraudulently transferred property, nor if successful, limit recovery to the transferred property or its value. Instead, these remedies would subject all of the assets of these non-debtor defendants to the claims of Keene's creditors.

■ As a general proposition, the Court will respect the separateness of corporations, and not subject the assets of one to the satisfaction of the liabilities of another. New York courts are reluctant to disregard the corporate entity, and New York law permits

standing to assert the Wrongful Transfer Claims does not foreclose the argument that someone else (e.g., the Creditor's Committee) should instead prosecute the claims on behalf of the estate. Keene's President and Chairman, Mr. Bailey, is one of the Individual Defendants in *Huffman* and *Coleman*, and may own shares in some or all of the Corporate Defendants. This issue, however, is not now before the Court.

6. This conclusion would also apply to the transfer of Bairnco's assets (i.e., the spun off stock). The theory of the second generation fraudulent transfer is that Bairnco and Keene are alter egos, and Bairnco's assets are available to satisfy Keene's creditors.

individuals to incorporate for the very purpose of enabling them to escape personal liability. *William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 600 (2d Cir.1989); *Walkovszky v. Carlton,* 18 N.Y.2d 414, 417, 223 N.E.2d 6, 7, 276 N.Y.S.2d 585, 587 (1966). Nonetheless, there are exceptions to this general rule, and it is the trustee who, in the first instance, is entitled to invoke them.

## (a) Piercing the Corporate Veil

■ "Broadly speaking, the courts will disregard the corporate form, or to use accepted terminology, 'pierce the corporate veil', whenever necessary to 'prevent fraud or to achieve equity'". *Walkovszky v. Carlton,* 18 N.Y.2d at 417, 223 N.E.2d at 7, 276 N.Y.S.2d at 587 (quoting *International Aircraft Trading Co. v. Mftrs. Trust Co.,* 297 N.Y. 285, 292, 79 N.E.2d 249, 252 (1948)); *accord William Wrigley Co. Jr. v. Waters,* 890 F.2d at 601 (quoting *A/S Domino Mobles v. Braverman,* 669 F.Supp. 592, 594 (S.D.N.Y.1987)); *Brunswick Corp. v. Waxman,* 599 F.2d 34, 36 (2d Cir.1979). One who uses control of a corporation to advance his own interests instead of the corporation's business will be liable for the corporation's acts under principles of agency. *Walkovszky v. Carlton,* 18 N.Y.2d at 417, 223 N.E.2d at 8, 276 N.Y.S.2d at 587.

■ Under the doctrine of piercing the corporate veil, also known as alter ego liability, a creditor can sue the parent or shareholder of his debtor if he can establish three factors: the parent or shareholder controls or dominates the debtor, the control or domination has been used to commit or perpetuate a fraud or wrong, and the creditor has suffered an injury or loss. 1 *Fletcher Cyclopedia of Corporations,* § 41.10 at 616 (1990) ("Fletcher"). *See e.g., Gosconcert v. Hillyer,* 158 B.R. 24, 27 (S.D.N.Y.1993). In a non-bankruptcy context, a creditor can invoke piercing to satisfy its claim from the assets of another corporation or person, but once bankruptcy ensues, the trustee alone has standing to prosecute the claim. Consequently, the creditors are prevented from pursuing the piercing claim unless and until it has been abandoned by the estate or the

creditor obtains relief from the automatic stay.

*St. Paul Fire and Insurance Co. v. PepsiCo, Inc.,* 884 F.2d 688 (2d Cir.1989), although interpreting Ohio rather than New York law, is instructive. PepsiCo had sold its subsidiary, Lee Way, to Commercial Lovelace, a wholly owned subsidiary of Banner Industries ("Banner"). Prior to the sale, and while Lee Way was still a PepsiCo subsidiary, Lee Way had procured certain surety bonds on the strength of PepsiCo's guaranty. After the sale, Lee Way defaulted, the surety honored the bonds, and sued PepsiCo on its guaranty.

PepsiCo joined Banner under an alter ego theory. PepsiCo claimed that Banner used its position as parent to dominate and control Commercial Lovelace in such a manner as to enable Commercial Lovelace to plunder the assets of Lee Way. Thus, Banner should be held liable to PepsiCo on account of PepsiCo's indemnification claim against Lee Way.

In the meantime, Lee Way had filed a bankruptcy proceeding in Ohio. Its trustee and creditors committee had asserted claims against Banner in the Ohio Bankruptcy Court. The claims asserted—against Banner, by PepsiCo in the *St. Paul* action and by the trustee and creditors committee in Lee Way's bankruptcy—alleged the same acts causing harm to Lee Way as well as the estate and its unsecured creditors, including PepsiCo. 884 F.2d at 695. The issue, therefore, was who, as between the trustee and PepsiCo, had standing to assert alter ego liability against Banner.

Standing, the Court ruled, is governed by state law. 884 F.2d at 700. The Bankruptcy Code permits the trustee to assert claims which belong to the debtor, or under his "strong arm" or avoiding powers, belong to the debtor's creditors under state law. *Id.* The Bankruptcy Code authorizes the trustee to prosecute such claims for the benefit of all creditors, and necessarily deprives individual creditors of standing to pursue the same claims for their sole benefit. Quoting the portion of the legislative history to Section 362 pertaining to the protection of creditors and equality of distribution, the Court of Appeals stated:

It is plain from this passage that Congress intended to protect all creditors by making the trustee the proper person to assert claims against the debtor. This reasoning extends to common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion. If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action. [Citations omitted].

Although the claims raised by PepsiCo are not against the debtor but are against a third party, the same reasoning applies. The claims, if proved, would have the effect of bringing the property of the third party into the debtor's estate, and thus would benefit all creditors. It therefore would be illogical to distinguish between this type of claim against a third party and a claim against the debtor....

*Id.* at 701; *accord Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1348–49 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988).

■ If the trustee has standing to assert the claim for the benefit of the estate, no individual creditor can assert the claim unless it has been abandoned or the creditor obtains relief from the automatic stay:

Nevertheless, we believe that under the Bankruptcy Code and the circumstances of this case, if either of PepsiCo's asserted causes of action in this suit is property of the debtor or a claim otherwise properly asserted by the bankruptcy trustee, Pepsi-Co does not have standing to raise that cause of action outside of the bankruptcy proceeding. Even if PepsiCo could overcome this jurisdictional hurdle, it would still have to show an abandonment of the claim by the bankruptcy trustee, 11 U.S.C. § 554, or a grant of relief from the automatic stay, 11 U.S.C. §§ 362(d), (e), to press its claims outside of the bankruptcy proceeding.

*Id.* at 702 (footnote omitted) *accord Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d 129, 131–32 (2d Cir.1984).

■ The New York cases are in accord; under New York law, the trustee has standing to assert claims based upon piercing the corporate veil or alter ego liability, and creditors are precluded from pursuing those claims until they have been abandoned. *See, e.g., Gosconcert v. Hillyer*, 158 B.R. at 28; *Green v. Bate Records, Inc. (In re Tenth Avenue Record Distributors, Inc.)*, 97 B.R. 163, 166 (S.D.N.Y.1989); *Goldhaber v. Tri-Equities, Inc. (In re Harry C. Partridge Jr. & Sons, Inc.)*, 112 B.R. 593, 596 (Bankr. S.D.N.Y.1990).

Thus, alter ego claims, like fraudulent transfer claims, must be asserted by the trustee. In such cases, the creditor's claim is general and indirect, the creditor's claim against the debtor is the *sine qua non* for asserting a remedy against the alter ego and the successful invocation of the remedy will increase the assets available for distribution to all creditors. Under those circumstances, the automatic stay protects creditors from distribution to the few on a first come, first serve basis, and limits standing to the trustee who can assert the claim on behalf of all creditors.

### (b) Successor Tort Liability

■ The principles relating to successor tort liability, and the results which they are designed to achieve, are similar to piercing the corporate veil. As a general rule, the purchasing corporation does not assume the tort liabilities of its predecessor unless (a) the purchaser expressly or implicitly agrees to do so, (b) there is a *de facto* consolidation or merger, (c) the purchaser is a mere continuation of the seller, or (d) the transfer of assets is for the fraudulent purpose of escaping liability. *Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529, 1534–35 (S.D.N.Y.1985); *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 245, 451 N.E.2d 195, 198, 464 N.Y.S.2d 437, 440 (1983); *Heights v. U.S. Electrical Tool Co.*, 138 A.D.2d 369, 370, 525 N.Y.S.2d 653, 654 (2d Dep't 1988); *see generally*, 15 Fletcher, § 7122, at 232.

Without passing upon the sufficiency of the pleadings, the Court reads the *Huffman* and *Coleman* complaints as invoking the fourth exception based upon the fraudulent transfer of assets to escape asbestos-related liability. In any event, the remedy against a successor corporation for the tort liability of the predecessor is, like the piercing remedy, an equitable means of expanding the assets available to satisfy creditor claims. The class action plaintiffs that invoke it allege a general injury, their standing depends on their status as creditors of Keene, and their success would have the effect of increasing the assets available for distribution to all creditors. For the same reasons stated with respect to the piercing claims, claims based upon successor liability should be asserted by the trustee on behalf of all creditors. *See Lumbard v. Maglia*, 621 F.Supp. at 1542 ("Section 544, the 'strong arm' provision, provides ample statutory authority for a Chapter 7 trustee's assertion of creditors' claims against third parties.").

### 4. Breach of Fiduciary Duty Claims

 The final general category of claims asserted in the *Coleman* and *Huffman* complaints, which overlaps those previously discussed, are the general claims for breach of fiduciary duty. Claims based upon breach of a fiduciary duty belong to a corporation, but once bankruptcy ensues, they are enforceable by the trustee. *Pepper v. Litton*, 308 U.S. 295, 307, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939); *accord Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d at 131; *Hassett v. McColley (In re O.P.M. Leasing Services, Inc.)*, 28 B.R. 740, 759 (Bankr.S.D.N.Y. 1983). Section 720 of New York's Business Corporation Law expressly authorizes a corporation or bankruptcy trustee to sue the corporation's officers and directors for breach of fiduciary duty, including misappropriation or diversion of assets:

(a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:

(1) To compel the defendant to account for his official conduct in the following cases:

(A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.

(B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.

(2) To set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness.

(3) To enjoin a proposed unlawful conveyance, assignment or transfer of corporate assets, where there is sufficient evidence that it will be made.

(b) An action may be brought for the relief provided in this section, and in paragraph (a) of section 719 (Liability of directors in certain cases) by a corporation, or a receiver, trustee in bankruptcy, officer, director or judgment creditor thereof, or, under section 626 (Shareholders' derivative action brought in the right of the corporation to procure a judgment in its favor), by a shareholder, voting trust certificate holder, or the owner of a beneficial interest in shares thereof.

(c) This section shall not affect any liability otherwise imposed by law upon any director or officer.

Despite its limiting language, Section 720 reaches beyond actions against officers and directors, and authorizes a lawsuit against the transferee of misappropriated assets if he knew that the transfer was unlawful. *In re Leasing Consultants Inc.*, 592 F.2d 103, 109 (2d Cir.1979); *Atlanta Shipping Corp. v. Chemical Bank*, 631 F.Supp. 335, 350 (S.D.N.Y.1986), *aff'd*, 818 F.2d 240 (2d Cir. 1987); *Wedtech Corp. v. Nofziger (In re Wedtech Corp.)*, 88 B.R. 619, 624 (Bankr.S.D.N.Y. 1988).

 Claims against officers and directors for breach of fiduciary duty, as well as claims against the knowing recipients of the fruits of their disloyalty, are property of the estate within the meaning of Section 541 of the Bankruptcy Code. The trustee, therefore, is the only person with standing to bring those claims, and absent their aban-

donment or relief from the automatic stay, the creditors are barred from asserting them.

■ In summary, Keene, in the first instance, is the only person with standing to assert the claims in the *Huffman* and *Coleman* cases, as well as any other claims, including but not limited to claims based upon fraudulent transfer, alter ego, successor tort liability or breach of fiduciary duty, which may have been asserted in other actions and share the following characteristics: (1) the claim alleges a general, indirect injury to the creditor, (2) the creditor's standing to sue the third party depends on its status as a creditor of Keene, and (3) the successful prosecution of the suit will increase the assets available to satisfy all creditor claims. The commencement or continuation of any actions concerning these claims is barred by the automatic stay. Even if the claims are not, themselves, property of the estate, they represent attempts by creditors to collect claims against the debtor from third parties which the trustee is authorized to recover under his or her "strong arm" or avoiding powers. Any property recovered by the trustee would be property of the estate, 11 U.S.C. § 541(a)(3), and the commencement or continuation of creditor action is stayed by Section 362(a)(1) of the Bankruptcy Code.

Further, to the extent such claims do not fall within the literal terms of the automatic stay, their commencement or continuation will be enjoined pursuant to Section 105(a) of the Bankruptcy Code. As noted, the automatic stay is designed to protect creditors and to ensure equality of distribution. The Court cannot sanction a practice which permits creditors to assert general, indirect claims in order to achieve a greater distribution on a first come, first serve basis from assets which the trustee has standing to recover, and which, if recovered, will be available to satisfy the claims of all creditors.

7. Although Keene does not concede that the Wrongful Transfer Claims are meritorious, it acknowledges that they are a "cloud" that hangs over the proceedings. Since third parties will question Keene's self examination into the viability of these claims, a disinterested examiner should, Keene says, step in.

## B. APPOINTMENT OF THE EXAMINER

### 1. Introduction

Under the second prong of its motion, Keene seeks the appointment of an examiner to investigate the allegations of fraudulent transfer, misappropriation and breach of fiduciary duties in the *Coleman* and *Huffman* complaints.[7] Statutory authority for the appointment of an examiner derives from Section 1104 of the Bankruptcy Code, which provides, in pertinent part, as follows:

> (b) if the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and hearing, the Court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
> (1) such appointment is in the best interest of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts or goods, services, or taxes or owing to an insider, exceed $5,000,000.

Keene argues that an examiner should be appointed under either ground.[8] Under the objective test in Section 1104(b)(2), Keene contends that its fixed, liquidated, unsecured debts, other than those for goods, services or taxes, or owing to an insider, exceed $5 million, and that the appointment is therefore mandated under the statute. In addition, Keene acknowledges that its ability, or the perception of its ability, to investigate the allegations in the *Coleman* and *Huffman*

8. The Committee contends that there is already enough evidence to authorize the prosecution of the Wrongful Transfer Claims. Hence, this case does not involve mere *allegations* of wrongdoing.

complaints is severely restricted, and consequently, the appointment of an examiner is also mandated under the more subjective interest of creditors test in Section 1104(b)(1).

The Official Committee of Unsecured Creditors (the "Committee") strenuously objects to the appointment of an examiner, raising both threshold procedural issues as well as issues going to the merits. The threshold issues challenge Keene's standing to seek the appointment of an examiner and argue that an examiner cannot be appointed unless the Court first denies a motion to appoint an operating trustee. The Committee also challenges the underlying merits of the application, claiming that Keene does not have qualifying debts in excess of $5 million, but even if it does, the appointment of the examiner is not mandated. Finally, the Committee argues that the appointment is not in the interest of creditors because the Keene's application is made in bad faith and will be unduly expensive.

For the reasons that follow, the Court concludes that the appointment of an examiner is in the interest of the creditors.

## 2. The Threshold Issues

■ Section 1109(b) of the Bankruptcy Code states that "[a] party in interest, *including the debtor* ... may raise and may appear and be heard on any issue in a case under this chapter." (Emphasis added). Section 1104(b) of the Bankruptcy Code authorizes a "party" to request the appointment of an examiner. These two sections are *in pari materia*, and provide, clearly and unambiguously, that a debtor is a party in interest who may seek the appointment of an examiner. Given the plain and unambiguous statutory language, the Court will enforce these provisions in accordance with their terms. *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (citing *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1970)).

■ The Committee's other threshold issue, that the Court cannot appoint an examiner unless it first refuses to appoint a

trustee, is also without merit. A motion to appoint an examiner stands on its own, and need not be part of an unsuccessful motion to appoint the trustee. *See In re Gilman Services, Inc.*, 46 B.R. 322, 327 (Bankr.D.Mass. 1985). Indeed, the Court has the authority to appoint an examiner *sua sponte. In re Public Service Company of New Hampshire*, 99 B.R. 177, 182 (Bankr.D.N.H.1989); *In re UNR Industries, Inc.*, 72 B.R. 789, 795 (Bankr.N.D.Ill.1987). Certainly, the Court does not have to deny its own motion to appoint a trustee before it can appoint an examiner *sua sponte.*

Finally, the argument finds no support in the statutory language. Section 1104(b) states, in substance, that the Court can appoint an examiner, under the appropriate circumstances, if it does not order the appointment of a trustee under subsection 1104(a). This is a limitation, not a requirement; and it means just what it says: if the Court has appointed a trustee, the Court cannot also appoint an examiner. This makes sense since the trustee's investigative powers are at least as great as an examiner's. See 11 U.S.C. § 1106(b). It does not mean, as the Committee suggests, that the Court must first refuse to appoint a trustee before it can direct the appointment of an examiner.

## 3. Appointment Under Section 1104(b)(2)

Section 1104(b)(2) appears to mandate, on its face, that the Court must appoint an examiner if the debtor has $5 million of qualifying debt. Despite this mandatory language, courts considering Section 1104(b)(2) have reached different results regarding its mandatory nature. *Compare In re Revco D.S. Inc.*, 898 F.2d 498, 500–01 (6th Cir.1990) (appointment is mandatory under Section 1104(b)(2)); *In re Mechem Financial of Ohio, Inc.*, 92 B.R. 760, 761 (Bankr.N.D.Ohio 1988) (same); *In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr.D.Mass.1987) (same); *In re 1243 20th Street, Inc.*, 6 B.R. 683, 685, n. 3 (Bankr.D.D.C.1980) (same); *In re Lenihan*, 4 B.R. 209, 211 (Bankr.D.R.I.1980) (same) *with In re Rutenberg*, 158 B.R. 230, 233 (Bankr.N.D.Fla.1993) (examiner not

mandatory where appointment would delay the administration of the case); *In re Shelter Resources Corp.*, 35 B.R. 304, 305 (N.D.Ohio 1983) (same) [9].

The Court need not resolve this split of authority because Keene has failed to demonstrate that it meets the qualifying debt requirement. The sole evidence concerning the amount of qualifying debt comes from the Affidavit of Timothy E. Coyne, Keene's Vice President for Finance, sworn to February 16, 1994. As of the petition date, Keene was a judgment debtor in connection with fifty-eight non-final judgments, aggregating $11,411,141.00, which were backed neither by appeal bonds or escrows. In addition, Mr. Coyne avers that Keene owes fixed, liquidated and otherwise qualifying debts on account of indemnification to the Corporate Defendants and Individual Defendants that exceed $3.0 million.

This proffer, however, is utterly contradicted by Keene's schedules, filed only six days later, which characterize these same unbonded judgments and indemnification claims as "contingent." Following in lockstep with the examiner motion, the schedules' characterization raises questions regarding the nature of the so-called qualifying debt which it was incumbent upon Keene to explain. In the absence of any explanation for these inconsistencies, the Court cannot rule as a matter of law that Keene is entitled to the appointment of an examiner under 11 U.S.C. § 1104(b)(2).

### 4. Appointment Under Section 1104(b)(1)

Although appointment of an examiner is not warranted or mandated under Section 1104(b)(2) of the Bankruptcy Code, the Court will nonetheless direct the appointment of an examiner in the interest of creditors under Section 1104(b)(1) of the Code. Alternatively, the Court will appoint an examiner on its own motion.

■ This is a textbook case calling for the appointment of an examiner in the interest of creditors. The allegations in connection with this motion center around the transfer of Keene's property in fraud of creditors by Keene's present and former officers and directors. Under the circumstances, and particularly in light of the fact that the Keene's Chairman and President is a defendant in the *Coleman* and *Huffman* cases, the appointment of an examiner to investigate whether the estate should pursue these claims is warranted:

> Section 1106 specifically delineates the duties of the examiner to conducting an investigation and rendering a statement of its investigation. The Court envisions that the investigation by an examiner in this case, particularly vis-a-vis the complex interrelationship of various corporate entities involved here, can be performed far more suitably by an examiner than by a creditors' committee. While a creditors' committee is well suited to overseeing the operations of a business, especially the financial and economic aspects of the debtor's operations, the examiner is far better able to undertake an in-depth investigation, a function warranted by the facts presented here. The Court believes that the appointment of an examiner is warranted whenever allegations of corporate fraud or misconduct are substantiated by credible evidence.

*In re 1243 20th Street, Inc.*, 6 B.R. at 686; *accord* M. Bienenstock, *Bankruptcy Reorganization* 299 (1987) ("Often, appointment of an examiner is warranted when the debtor's transactions with affiliates should be investigated.").

Although one would expect the Committee to be allied with Keene on this motion, it attacks it zealously. It contends that there is no need for an examiner, that the motion is interposed for purposes of delay, and will result in the absolution of the Individual Defendants and Corporate Defendants. In short, Keene is acting in bad faith. The Committee's argument, however, makes no sense.

---

9. In light of the Sixth Circuit's decision in *Revco,* the continuing vitality of *Shelter Resources* is questionable.

To begin with, Keene's motion will have the opposite effect than the Committee claims: by seeking an examiner, Keene has accelerated rather than delayed the inevitable continuation of these lawsuits. As set forth in the first part of this decision, the automatic stay stopped the continued prosecution of the Wrongful Transfer Claims. Had Keene done nothing, these Wrongful Transfer Claims would have remained in legal limbo, waiting for someone to step forward to assert control over them. Instead, Keene moved for an appointment of an examiner, *before a Committee was appointed,* thereby focusing the Court, the creditors, and eventually the Committee, on the precise issue. Consequently, the Committee's contention that Keene's motion is a dilatory tactic is belied by the facts.

In addition, the Committee apparently misperceives the object and effect of the appointment of an examiner. Specifically, the Committee's opposition implies that if an examiner reports that the Wrongful Transfer Claims lack merit or are not worth pursuing, the claims will disappear from the case and the Corporate Defendants and Individual Defendants will be absolved.

The examiner's report may contribute to a determination of who will prosecute the Wrongful Transfer Claims and where they will be prosecuted, but it will not absolve the Corporate Defendants and Individual Defendants from liability. If the Wrongful Transfer Claims are deemed valueless, and should not be prosecuted at the expense of the estate and its creditors, they will still be prosecuted in one form or another. For instance, under *In re STN Enterprises,* 779 F.2d 901 (2d Cir.1985), the Committee could apply to the Court for authority to prosecute the claims on a contingency fee basis, thereby sparing the estate and its creditors the expense of large legal fees. If neither Keene nor the Committee prosecutes the claims, Keene could be compelled to abandon the claims in which event they can be prosecuted by the individual creditors. Alternatively, the Corporate Defendants and Individual Defendants could determine that it was in their interest to reach a settlement with Keene and/or the Committee as part of or separate from a plan without further litigation.

Furthermore, there is scant evidence that the examiner's investigation will be unduly expensive, or more expensive than the Committee's "gung ho" attitude of prosecuting claims which may lack merit or be time-barred. In this regard, the majority of the Wrongful Transfer Claims accrued more than six years prior to the filing of the *Huffman* or *Coleman* complaints or Keene's petition, and may be time-barred under New York's six year statute of limitations, CPLR § 213, absent some doctrine which tolls or extends the statute of limitations.

The Court's conclusion is bolstered by indications that the Committee has abdicated its responsibility to exercise independent judgment on behalf of the creditors. Arguing at the hearing why the examiner motion should be denied, Committee counsel emphasized the veto power that the "Plaintiffs' Bar" (i.e., lawyers who do not hold claims against Keene) apparently intends to exercise if the Wrongful Transfer Claims are not returned to them:

> MR. ISRAEL [Committee Counsel]: The best interests here, I think the factors that should concern the analysis here are cost, the issue of what the purpose would be served by an Examiner, the issue of, the fact, the practical fact that the Plaintiffs' Bar has determined that it will proceed with its fraudulent conveyance claims in any event, that it would not agree to—
>
> THE COURT: How are they going to do that?
>
> MR. ISRAEL: It would not agree to a plan that did not allow them to proceed with those claims. That's my understanding.

Hearing Transcript, dated February 18, 1994, at 91–92.

The Plaintiffs' Bar, the Committee, or both, have drawn a line in the sand regardless of its effect on the creditors they represent. The determination of the "Plaintiffs' Bar" to proceed with the Wrongful Transfer Claims "in any event"—claims which are automatically stayed—flouts the law, and the Committee's advocacy of this view creates the impression that it is representing the "Plaintiffs' Bar" and not the plaintiffs.

It is patent to the Court that the interest of creditors will be served by the appoint-

ment of a disinterested examiner. The only remaining question concerns the scope of the examiner's investigation.

### 5. Scope of the Examiner's Investigation

The examiner shall evaluate and report whether any viable claims exist on behalf of the estate, that are not time-barred by the statute of limitations, concerning the following transactions:

(1) The 1983 transfer of Keene's Industrial Bearings and Fittings Operations to Kaydon for approximately $65 million.

(2) The 1984 transfer of Keene's Lighting Divisions to Genlyte in 1984 for approximately $52.5 million.

(3) The 1986 transfer of Keene's Cutting Services Divisions to Kasco in 1986 for approximately $9 million.

(4) The 1987 and 1988 transfers of Keene's Electromagnetic and Shielding Divisions to Shielding for approximately $49.5 million.

(5) The 1988 transfer of Keene's Laminate and Coated Products Divisions to Arlon for an aggregate purchase price of $48 million; and

(6) The 1990 spinoff of Keene's shares to Bairnco's shareholders.

In the event that the examiner determines that potentially viable claims exist in connection with either the Genlyte or Kaydon transfers, the examiner shall then evaluate and report as to whether any claims exist on behalf of Keene concerning the spinoff of the Genlyte and Kaydon shares to Bairnco's shareholders.

In order for the Court and the parties to monitor the progress and expense of the examiner, the Court directs that within sixty days of the effective date of the examiner's appointment, unless a later date is fixed by the Court, the examiner shall submit a Preliminary Report to Keene, the Committee and the United States Trustee which shall set forth the examiner's preliminary conclusions regarding the matters within the scope of the investigation, the cost and expenses to date, and a projected budget and timetable for his or her final report.

Upon the submission of the Preliminary Report, Keene shall schedule a hearing, on notice to the Committee, the United States Trustee and any party that has requested notice, at which time the Court and the parties shall consider the Preliminary Report, and whether further investigation or evaluation by the examiner is desirable or necessary.

The examiner's budget for this stage of the investigation culminating in the Preliminary Report is $100,000.00, unless increased by the Court, and the examiner and the examiner's professionals shall make application to the Court in accordance with Sections 330 and 331 of the Bankruptcy Code and the Southern District Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases.

The Court is confident that if all constituencies cooperate with the examiner, and share whatever information they have, the examiner will be able to complete his or her duties within the time and budget that the Court has established.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52, made applicable herein by Fed.R.Bankr.P. 7052. Settle order on notice.